STATE OF NORTH CAROLINA v. DONNIE WILLIAMS

No. 4

(Filed 10 October 1973)

1. Assault and Battery § 5; Homicide § 21— discharging firearm into occupied building — first degree murder — sufficiency of evidence

In a prosecution for murder and for unlawfully discharging a firearm into an occupied building, defendant's motions for nonsuit were properly overruled where there was evidence sufficient to permit a jury to find that defendant, in violation of G.S. 14-34.1, discharged a .22 rifle into the building in which deceased operated a poolroom and which was then occupied by deceased and his brother; that he did so wilfully and wantonly; and that the bullet so discharged by defendant proximately caused the death of deceased.

2. Homicide § 4— felony-murder rule — felony creating risk to human life

Any unspecified felony is within the purview of the felony-murder statute if the commission or attempted commission thereof creates any substantial foreseeable human risk and actually results in the loss of life. G.S. 14-17.

3. Assault and Battery § 5— discharge of firearm into occupied building — statute construed

A person is guilty of the felony created by G.S. 14-34.1 if he intentionally, without legal justification or excuse, discharges a firearm into an occupied building with knowledge that the building is then occupied by one or more persons or when he has reasonable grounds to believe that the building might be occupied by one or more persons.

4. Assault and Battery § 5; Homicide § 4— discharge of firearm into occupied building — felony-murder rule applicable

Violation of G.S. 14-34.1 prohibiting the discharge of a firearm into an occupied building is an unspecified felony within the purview of the felony-murder rule.

---

State v. Williams

---

5. **Assault and Battery § 15; Homicide § 23— discharge of firearm into occupied building — insufficient instructions — new trial**

In a prosecution for murder and for unlawfully discharging a firearm into an occupied building, defendant is entitled to a new trial where the trial court failed to give any instruction whatever applying the law to the facts stated in the testimony of one witness where that testimony, if accepted, (1) disclosed facts sufficient in law to constitute a complete defense to murder committed in the perpetration of the felony created by G.S. 14-34.1, and (2) disclosed that the fatal shooting occurred inside the building, thus rendering defendant guilty of no more than murder in the second degree in the absence of proof that the killing was intentional and with premeditation and deliberation.

6. **Criminal Law § 26; Homicide § 4— felony-murder prosecution — separate punishment for felony and murder**

When a felony within the purview of G.S. 14-34.1 is relied upon as an essential of and the basis for the conviction of a defendant for murder in the first degree under the felony-murder rule, no additional punishment can be imposed for such felony as an independent criminal offense.

Justice HUSKINS dissents.

APPEAL by defendant from *Martin, S.J.,* at June 1972 Session of JOHNSTON Superior Court.

Defendant was indicted in separate bills (1) for the murder of Herman Adams and (2) for "unlawfully, wilfully and feloniously discharg[ing] a firearm to wit: 22 caliber rifle into a building to wit: Adams Pool Room (Cleveland School Community), while said building was occupied by Herman Adams and Carlton Adams. . . ." Each indictment alleged that the criminal offense described therein was committed on 10 April 1971. The cases were consolidated for trial.

The only evidence was that offered by the State.

The State's evidence, *apart from the testimony of Carlton Adams,* tends to show the facts narrated below.

Herman Adams operated a store and poolroom in the Cleveland School community. Sometimes he kept the poolroom open all night. It was open during the early morning hours of 10 April 1971.

About 2:00 a.m. on 10 April 1971 a car containing six occupants arrived at Herman Adams's place of business. Sherrill Bryant, the owner-driver, "shot pool there every day and every night." Bryant was accompanied by his wife, by Purcell

Williams and wife, Shirley Williams, by Robert Williams, and by Donnie Williams.

Herman Adams, his wife, and Carlton Adams, Herman's brother, and "two or three white boys," were in the poolroom when the Bryant party arrived. Bryant and Purcell Williams shot pool for an hour and a half. During this period Donnie was somewhere in the poolroom and Shirley Williams was out in the yard somewhere. After Bryant and Purcell Williams had been shooting pool for about an hour and a half, a fight started between Herman Adams and one Marvin Hamilton (referred to also as Marvin Raines) because Marvin refused to leave when ordered to do so by Herman Adams. Bryant got into this fight, "helping Herman." Although others were in the poolroom, only Herman Adams, Bryant and Marvin were involved in the fighting. While Bryant was so engaged, Carlton Adams shot Bryant in the leg. Thereupon, Bryant left the poolroom, went to his car, got his rifle, went back into the poolroom and there shot Carlton Adams. After Bryant had shot Carlton Adams, Herman Adams walked with Bryant to the door of the poolroom. Herman Adams had not been shot at that time.

Leaving the poolroom, Bryant went to his car which was parked "about ten or fifteen feet from the store." He put his rifle on the floorboard in front of the front seat. Donnie Williams got on the right front seat and picked up the rifle. When Bryant had backed his car to a point approximately thirty or thirty-five feet from the building, Donnie Williams fired the rifle "at the building." The bullet passed through the window where Herman Adams was standing, entered Herman Adams's brain and caused his death.

Investigating officers testified they could not tell whether the hole in the window resulted "from a bullet entering the building or exiting the building."

Bryant testified that, after he had shot Carlton Adams, he told the members of his party, "Let's go, I'm going to the hospital." He further testified that he "left the rifle at [his] brother's house on the way to the hospital." He further testified that Herman Adams "was just like [his] daddy"; that he had known Herman Adams as a friend about all of his (Bryant's) life; and that he had had no trouble with Herman Adams or with Carlton Adams that day.

The testimony of Carlton Adams, as set forth in narrative form in the agreed case on appeal, is quoted in full below:

"My name is Joseph Carlton Adams, and I live in Woodbridge, Virginia. I was living there in April, 1971 and came to Johnston County on April 10, 1971, to visit my brother. I had been in my brother's store about 30 minutes when Donnie Williams and the others came in. Herman told them to get out and he said they weren't going out and he threw up and went to shooting. One shot hit me and I went down and when I came to there won't anybody there and Herman was lying at my feet dead. I could hear glass and stuff breaking, the window; shooting. Herman had not had any trouble with Donnie Williams or Sherrill Bryant that I know of. When they took me to the hospital, Herman Adams was lying right at the end of the counter right flat on his face with his head turned down. Herman was lying right at the end of the counter; the big window right at the end of the counter facing the road. I saw blood running from the side of Herman's face and head as I was leaving."

As to the first (murder) indictment, the jury returned a verdict of guilty of murder in the first degree with recommendation of life imprisonment; and judgment, which imposed a sentence of life imprisonment, was pronounced.

As to the second (discharging firearm into occupied building) indictment, the jury returned a verdict of guilty as charged; and the court pronounced judgment imposing a prison sentence of ten years.

On 6 March 1973 this Court entered an order allowing defendant's motion that he be allowed to file a delayed appeal in the murder case and to have his appeal in the other case (discharging firearm into occupied building) heard by the Supreme Court without prior determination in the Court of Appeals.

*Attorney General Robert Morgan and Associate Attorneys Russell G. Sherrill III and Ralf F. Haskell for the State.*

*Barringer, Howard & Gruber by Thomas L. Barringer for defendant appellant.*

BOBBITT, Chief Justice.

[1]   Defendant excepted to and assigns as error the court's denial of his motions for judgments as in case of nonsuit.

When considered in the light most favorable to the State, there was evidence sufficient to permit a jury to find that defendant, in violation of G.S. 14-34.1, discharged Sherrill Bryant's .22 rifle into the building in which Adams's poolroom was operated and which was then occupied by Herman Adams and by Carlton Adams; that he did so wilfully and wantonly; and that the bullet so discharged by defendant proximately caused the death of Herman Adams. Defendant's motions for nonsuit were properly overruled.

G.S. 14-34.1 provides: *"Discharging firearm into occupied property.*—Any person who wilfully or wantonly discharges a firearm into or attempts to discharge a firearm into any building, structure, vehicle, aircraft, watercraft, or other conveyance, device, equipment, erection, or enclosure while it is occupied is guilty of a felony punishable as provided in § 14-2."

The issue submitted to the jury was whether defendant was guilty of murder in the first degree on the ground that he was guilty of committing the felony defined in G.S. 14-34.1 and in the perpetration thereof shot and killed Herman Adams.

G.S. 14-17 defines murder in the first degree as follows: "A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary *or other felony,* shall be deemed to be murder in the first degree. . . ." (Our italics.) A murder committed in the perpetration or attempt to perpetrate any felony within the purview of G.S. 14-17 is murder in the first degree without proof of an intentional killing with malice after premeditation and deliberation. *State v. Maynard,* 247 N.C. 462, 469, 101 S.E. 2d 340, 345 (1958), and cases cited.

Is the criminal offense created by G.S. 14-34.1 a felony within the purview of G.S. 14-17?

There are many decisions of this Court which hold that homicides committed in the perpetration or attempt to perpetrate the *specified* felonies of arson, burglary, rape and robbery constitute murder in the first degree. *State v. Thompson,* 280 N.C. 202, 209-10, 185 S.E. 2d 666, 671 (1972), and cases cited. Too, we have held that homicides constitute murder in the first degree when committed in the perpetration or attempt to perpetrate the following *unspecified* felonies: kidnapping, *State v.*

*Streeton*, 231 N.C. 301, 56 S.E. 2d 649 (1949) ; felonious escape, *State v. Lee*, 277 N.C. 205, 176 S.E. 2d 765 (1970) ; sodomy, *State v. Doss*, 279 N.C. 413, 183 S.E. 2d 671 (1971) ; feloniously breaking into a store or dwelling with intent to commit larceny, *State v. Covington*, 117 N.C. 834, 23 S.E. 337 (1895) ; *State v. Kelly*, 216 N.C. 627, 6 S.E. 2d 533 (1940) ; *State v. Thompson*, *supra*.

[2]   In *State v. Thompson, supra*, at 211, 185 S.E. 2d at 672, the opinion states: "In our view, and we so hold, any unspecified felony is within the purview of G.S. 14-17 if the commission or attempted commission thereof creates any substantial foresee-able human risk and actually results in the loss of life. This includes, but is not limited to, felonies which are inherently dangerous to life. Under this rule, any unspecified felony which is inherently dangerous to human life, or foreseeably dangerous to human life due to the circumstances of its commission, is within the purview of G.S. 14-17."

G.S. 14-34.1 refers to the wilful or wanton discharge or attempt to discharge the firearm "into any building, structure, vehicle, aircraft, watercraft, or other conveyance, device, equipment, erection, or enclosure while it is occupied." In a factual situation involving the actual discharge of a firearm into an occupied building, we must decide (1) what conduct constitutes the felony created by G.S. 14-34.1, and (2) whether such felony is an unspecified felony within the purview of G.S. 14-17. In making these determinations, we are mindful (1) that criminal statutes are to be construed strictly, and (2) that application of the felony-murder rule supplants the necessity for proof of an intentional killing with malice after premeditation and deliberation.

The protection of the occupant(s) of the building was the primary concern and objective of the General Assembly when it enacted G.S. 14-34.1. This statute is not violated unless the accused discharges or attempts to discharge the firearm into a building *while it is occupied.*

In our view, the words "wilful" and "wanton" refer to elements of a single crime. Ordinarily, " '[w]ilful' as used in criminal statutes means the wrongful doing of an act without justification or excuse, or the commission of an act purposely and deliberately in violation of law." *State v. Arnold*, 264 N.C. 348, 141 S.E. 2d 473 (1965). "Wantonness . . . connotes inten-

tional wrongdoing. . . . Conduct is wanton when in conscious and intentional disregard of and indifference to the rights and safety of others." *Hinson v. Dawson,* 244 N.C. 23, 28, 92 S.E. 2d 393, 396-97 (1956). The attempt to draw a sharp line between a "wilful" act and a "wanton" act in the context of G.S. 14-34.1 would be futile. The elements of each are substantially the same.

[3] We hold that a person is guilty of the felony created by G.S. 14-34.1 if he intentionally, without legal justification or excuse, discharges a firearm into *an occupied building* with knowledge that the building is then occupied by one or more persons or when he has reasonable grounds to believe that the building might be occupied by one or more persons.

[4] When G.S. 14-34.1 is so construed, we are of opinion, and so hold, that the violation thereof is an unspecified felony within the purview of G.S. 14-17.

We note that prior to the enactment of G.S. 14-34.1, a killing caused by conduct which now constitutes a violation of this statute would not have been more than murder in the second degree in the absence of proof that *the killing* was intentional and with premeditation and deliberation. *State v. Capps,* 134 N.C. 622, 46 S.E. 730 (1904).

Since the question now decided is one of first impression, it is understandable that the trial judge failed to instruct the jury in accordance with the interpretation of G.S. 14-34.1 set forth above.

Defendant excepted to and assigns as error this excerpt from the charge: "[T]here are three possible verdicts which you might return. You may find the defendant guilty of first degree murder with no recommendation; guilty of first degree murder with recommendation of life imprisonment; or not guilty." (Note: This case was tried prior to the decision on 29 June 1972 of *Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726.)

The quoted excerpt must be considered in relation to the portion of the charge which preceded it, to wit: "[I]f you find from the evidence beyond a reasonable doubt that on or about the 10th day of April, 1971, Donnie Williams shot Herman Adams with a .22 caliber rifle and thus proximately caused his death and that he, Donnie Williams, did this while com-

mitting or attempting to commit the felony of discharging a firearm into occupied property, as this has been defined for you, it would be your duty to return a verdict of guilty of murder in the first degree. If you do not so find or have a reasonable doubt as to one or both of these things, it would be your duty to return a verdict of not guilty."

No portion of Carlton Adams's testimony is referred to in the charge either in the court's review of the evidence or in the statement of contentions.

[5] The theory of the State's case, felony-murder, was based on the testimony of Sherrill Bryant, Purcell Williams and Shirley Williams. Their testimony is sharply contradicted by the testimony of Carlton Adams. Carlton Adams testified that "When Donnie Williams and the others came in" Herman Adams's store, "Herman told them to get out and *he* said they weren't going out and *he* threw up and went to shooting." (Our italics.) Carlton Adams further testified that "[o]ne shot hit [him] and [he] went down and when [he] came to there won't anybody there and Herman was lying at [his] feet dead."

Based on Carlton Adams's testimony, a jury would be permitted to find that any shooting done by defendant was done *inside* the poolroom in the course of a quarrel with Herman Adams concerning whether the party brought there by Bryant would have to leave the poolroom. When considered in context, the italicized word *he* seems to refer to Donnie Williams. It certainly refers to one of the group which included Bryant, Purcell Williams and Donnie Williams, which entered Herman Adams's poolroom about 2:00 a.m. Carlton Adams's testimony also tends to show that the shooting occurred immediately upon the arrival of these men, and that they were arrayed *against* Herman Adams and Carlton Adams and shot both of them. This testimony completely contradicts the testimony of Bryant and of Purcell Williams to the effect that they shot pool for an hour and half after their arrival before any altercation developed. It also completely contradicts the testimony of Bryant to the effect that he undertook to assist Herman Adams while Herman Adams was attempting to make one Marvin Hamilton (or Raines) leave his place of business and that he was shot by Carlton Adams when he (Bryant) was helping Herman Adams. Carlton Adams's testimony also tends to show that when Bryant's party left the poolroom to drive away both

Herman Adams and Carlton Adams were *inside* the poolroom, Herman fatally wounded and Carlton wounded and later taken to the hospital.

G.S. 1-180 requires a trial judge to instruct the jury as to "every substantial and essential feature of the case embraced within the issue and arising on the evidence, and this without any special prayer for instructions to that effect." *State v. Merrick,* 171 N.C. 788, 795, 88 S.E. 501, 505 (1916) ; *State v. Ardrey,* 232 N.C. 721, 723, 62 S.E. 2d 53, 55 (1950) ; *State v. Mercer,* 275 N.C. 108, 116, 165 S.E. 2d 328, 334 (1969).

Although defendant did not testify or offer evidence, he was entitled to an instruction applying the law to the facts stated in the testimony of Carlton Adams. Carlton Adams's testimony, if accepted, disclosed facts sufficient in law to constitute a complete defense to murder committed in the perpetration of the felony created by G.S. 14-34.1. Too, if the fatal shooting of Herman Adams occurred inside of his poolroom, and if the jury found beyond a reasonable doubt that defendant fired the shot that killed Herman Adams, the defendant would not be guilty of more than murder in the second degree in the absence of proof that *the killing* was intentional and with premeditation and deliberation. The court's failure to instruct as to the applicable law arising on the evidence of Carlton Adams applies equally to both indictments. For error in this respect, the verdicts and judgments are vacated and defendant is awarded a new trial in each case.

[6] In view of the fact that the court pronounced separate judgments as set out in our preliminary statement, we deem it appropriate to note that when a felony within the purview of G.S. 14-34.1 is relied upon as an essential of and the basis for the conviction of a defendant for murder in the first degree under the felony-murder rule, no additional punishment can be imposed for such felony as an independent criminal offense. *State v. Thompson, supra,* at 217, 185 S.E. 2d at 676; *State v. Peele,* 281 N.C. 253, 260, 188 S.E. 2d 326, 331-32 (1972) ; *State v. Carroll,* 282 N.C. 326, 333, 193 S.E. 2d 85, 89 (1972).

New trial.

Justice HUSKINS dissents.