STATE OF NORTH CAROLINA v. SCOTT ANDREW CANADY, Defendant

No. COA07-1278

(Filed 5 August 2008)

**1. Firearms and Other Weapons— discharging firearm into occupied property—sufficiency of evidence—bullet hit exterior wall**

The trial court did not err by denying defendant's motions to dismiss the charge of discharging a firearm into occupied property because: (1) contrary to defendant's assertion, the intent element in N.C.G.S. § 14-34.1 applies merely to the discharging and not to the eventual destination of the bullet; (2) there was evidence that supported the conclusion that defendant intended to discharge the gun, including witness testimony establishing that defendant made threatening statements about his willingness to shoot if he needed to and that he pointed the gun at a person's head or near his head, and defendant's own testimony showed that he fired down and away as to not hurt anyone; (3) although defendant contends there was insufficient evidence that he shot "into" the pertinent apartment when the bullet hit the exterior wall, the claim that the exterior walls of the apartment do not

STATE v. CANADY

[191 N.C. App. 680 (2008)]

constitute part of the enclosure is without legal merit since discharging a firearm into an enclosure does not have to mean through the wall of the enclosure; (4) photographs of the hole by the door and testimony of the bullet entering the wall provided substantial evidence to support a conclusion of defendant's guilt; and (5) the primary purpose and objective of the enactment of N.C.G.S. § 14-34.1 was the protection of the occupants of the building, and ruling that striking the exterior wall of the apartment was not "into" the apartment would contravene that purpose.

**2. Firearms and Other Weapons— discharging firearm into occupied property—instruction—justification or excuse**

The trial court did not commit plain error in a felony discharging a weapon into occupied property case by its instruction that in order to find defendant guilty, the jury had to find that defendant discharged the firearm "without justification or excuse, that is, in self-defense," even though defendant contends it led the jury to believe that self-defense was the only justification or excuse, because: (1) defendant presented no evidence of any justification or excuse other than self-defense at trial, and the absence of any evidence of another justification or excuse freed the trial court from having to leave the instruction open to other excuses; and (2) the issue of whether defendant accidentally fired was not a justification or excuse for shooting, but rather went to the element of intent.

**3. Firearms and Other Weapons— discharging firearm into occupied property—instruction—meaning of "into"**

The trial court's instruction in a prosecution for discharging a firearm into occupied property that "into" meant "into any part of the property structure" adequately conveyed to the jury that the outside wall is a part of the enclosure of the apartment and was not error.

**4. Criminal Law— instruction—self-defense—duty to retreat**

The trial court did not commit plain error in a felony discharging a weapon into occupied property case by failing to instruct the jury when giving the instruction on self-defense that defendant did not have a duty to retreat because: (1) even if the jury believed defendant was under a duty to retreat, defendant's testimony that he was unable to retreat would satisfy such a duty, thus making the instruction superfluous; (2) it was likely that

defendant did have a duty to retreat, making an instruction to the contrary incorrect, when there was evidence that defendant entered the fight voluntarily as evidenced by his telling another person not to be brave, and saying that this was a situation where somebody could get shot; (3) engaging in a verbal disagreement with threatening language did not indicate abandonment of the fight; (4) it was not necessary to determine whether defendant entered the fight voluntarily when, at most, defendant was facing a misdemeanor assault that did not entitle his use of a firearm in defense; (5) regardless of who started the altercation, defendant was required to retreat from the nonfelonious assault rather than escalate the incident through the use of a weapon; and (6) if anything, giving a more in-depth instruction on self-defense and duty to retreat would probably have damaged defendant's case.

**5. Firearms and Other Weapons— discharging firearm into occupied property—sufficiency of indictment—knew or should have known property was occupied**

An indictment in a felony discharging a weapon into occupied property case gave the trial court subject matter jurisdiction even though defendant contends it failed to allege the element that defendant knew or should have known that the property was occupied at the time he discharged the firearm because: (1) the Court of Appeals has already considered and rejected this argument; and (2) the indictment was couched in the language of N.C.G.S. § 14-34.1 and alleged all of the essential elements.

**6. Firearms and Other Weapons— discharging firearm into occupied property—instruction—into occupied property**

The trial court did not err in a felony discharging a weapon into occupied property case by instructing that "into" means "into any part of the property structure," because: (1) defendant waived his constitutional argument by failing to raise it at the trial level and failing to cite any constitutional authority in support of his argument; and (2) the Court of Appeals already concluded that there is no statutory basis for distinguishing between the interior and exterior parts of the walls of an enclosure.

Appeal by defendant from judgment entered 21 March 2007 by Judge Ronald L. Stephens in Wake County Superior Court. Heard in the Court of Appeals 16 April 2008.

STATE v. CANADY

[191 N.C. App. 680 (2008)]

*Attorney General Roy Cooper, by Special Deputy Attorney General Victoria L. Voight, for the State.*

*George B. Currin for defendant.*

ELMORE, Judge.

On the evening of 9 August 2004, Nicole Dobbins and her two roommates were entertaining some friends. The group consisted of the two roommates' boyfriends, Scott Schabot and Kyle Morin; the women's neighbor in apartment 204, Nicholas Siwy; and one of Dobbins' co-workers, Sean Hairr. Earlier that night, Dobbins had an argument with her boyfriend, Daniel Timmermans, about his alleged infidelity that resulted in her ending the relationship. Timmermans' testimony on this issue conflicts with Dobbins' testimony. He stated that they were engaged to be married, had not had a fight earlier that day, and that she was having a "girls' night" that night. He testified that he stopped by Dobbins' apartment around 10:00 or 11:00 p.m., where he saw that there was a "party" on her balcony. Timmermans then called Scott Andrew Canady (defendant) to come over to Dobbins' apartment, allegedly to join the party. Timmermans met defendant at the entrance to the apartment complex because defendant did not know exactly where Dobbins lived within the complex. Defendant then took Timmermans in his car to the apartment.

Upon arriving at Dobbins' apartment with defendant, Timmermans claims that he saw that "his fiancé was kissing another man" on the balcony. Defendant stayed at the bottom of the steps leading up to Dobbins' second floor apartment while Timmermans went upstairs to speak to Dobbins. There is conflicting testimony concerning a possible verbal and/or physical confrontation between Dobbins' friend, Schabot, and Timmermans as Timmermans tried to gain access to Dobbins' apartment to speak to her. Defendant then went up the stairs because he claimed that he heard a "commotion." Timmermans then asked defendant to wait there on the landing for him while he spoke to Dobbins. Timmermans knocked repeatedly on the apartment door and Dobbins eventually came out of the apartment. They went down the stairs to the parking lot to talk.

While the couple was talking, defendant remained on the staircase landing with Schabot and Morin, another of the guests at Dobbins' apartment. There is conflicting testimony concerning how many people were on the landing and where they were standing. Defendant testified that there were "five people" on the landing

and that they were blocking his access to the stairs. Timmermans testified that when he left the apartment to speak to Dobbins in the parking lot there were "about four or five people" on the breezeway. He also testified that when he looked up the staircase after hearing a gunshot there were "about seven people up top . . . of the steps." Schabot and Morin testified that they were the only ones on the landing with defendant and that defendant was standing at the top of the stairs. Siwy also testified that he went out onto the breezeway within twenty to thirty seconds after the gunshot and only Schabot and Morin were on the landing while "somebody" was walking down the stairs.

Schabot and Morin exchanged words with defendant, with Schabot asking if defendant was Timmermans' bodyguard and why he was there. Defendant told Schabot "not to be brave" when Schabot tried to look down the stairs to see how the conversation between Dobbins and Timmermans was going. The disagreement escalated and Schabot testified that defendant said that this "was a situation where somebody could get shot at or shot." Schabot then asked if defendant was going to shoot him, defendant responded that "if he needed to he would" and Schabot told him to do it. Defendant pulled out his gun, possibly from a holster, and pointed the gun at Schabot's head. Schabot repeated that defendant should shoot him and defendant fired his gun. The shot went past Schabot's head and lodged at head height somewhere behind the siding of the exterior wall beside Siwy's apartment.

Schabot and defendant continued accosting each other for "a couple of seconds" after the shot was fired. Then defendant returned the gun to its original location on his person and ran down the steps. Siwy immediately called the police and several police officers and the City/County Bureau of Identification responded at about 2:40 a.m.

Before Timmermans and defendant arrived at the apartment, Siwy left Dobbins' apartment to go to his apartment right across the breezeway. He went to order some late night pizza. He was unaware of the argument going on between defendant and Schabot and the conversation between Dobbins and Timmermans. After he found a pizza place that was still open, he began walking to the door to go get the pizza. He was about "ten steps from the door" when he heard the gunshot. Siwy testified that "[i]f it didn't hit the frame . . . it could have went right through the apartment and hit me when I was walking out."

On 21 March 2007, a jury found defendant guilty of the charge of felony discharging a firearm into occupied property. The trial court sentenced defendant to a suspended sentence of seventeen to thirty months and supervised probation for twenty-four months. Defendant filed notice of appeal with this Court two days later.

[1] Defendant's first assignment of error concerns his motions to dismiss the charge of discharging a firearm into occupied property. He claims that the motions should have been granted because there was insufficient evidence to support each element of the offense. Defendant alleges that there was insufficient evidence that he intentionally discharged the firearm at either Schabot or at Siwy's apartment and that he fired "into" the apartment.

"In ruling on a defendant's motion to dismiss, the trial court should consider if the state has presented substantial evidence on each element of the crime and substantial evidence that the defendant is the perpetrator." *State v. Replogle*, 181 N.C. App. 579, 580, 640 S.E.2d 757, 759 (2007) (citation and quotations omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Denny*, 361 N.C. 662, 664-65, 652 S.E.2d 212, 213 (2007) (citations and quotation omitted). "The evidence should be viewed in the light most favorable to the state, with all conflicts resolved in the state's favor. . . . If substantial evidence exists supporting defendant's guilt, the jury should be allowed to decide if the defendant is guilty beyond a reasonable doubt." *Replogle* at 581, 640 S.E.2d at 759 (citation and quotations omitted). "This is true even though the evidence may support reasonable inferences of the defendant's innocence." *State v. Everette*, 361 N.C. 646, 651, 652 S.E.2d 241, 244-45 (2007) (citation and quotations omitted).

When we consider the elements of the crime of discharging a firearm into occupied property, it becomes obvious that defendant's assertion of insufficient evidence of intent is irrelevant. "The elements of the offense [defendant is charged with] are (1) the willful or wanton discharging (2) of a firearm (3) into any building (4) while it is occupied." *State v. Jones*, 104 N.C. App. 251, 258, 409 S.E.2d 322, 326 (1991). Defendant contends that there was not "legally sufficient evidence that [d]efendant either intentionally discharged his firearm at Scott Schabot or at Apartment 204." However, this argument is irrelevant since the construction of the statute clearly shows that the intent element applies merely to the discharging, not to the eventual destination of the bullet.

A person violates this statute if he intentionally, without legal excuse or justification, discharges a firearm into an occupied building with knowledge that the building is then occupied by one or more persons or when he has reasonable grounds to believe that the building might be occupied by one or more persons.

*Id.* (citation omitted).

Furthermore, our Supreme Court has stated that "[d]ischarging a firearm into a vehicle does not require that the State prove any specific intent but only that the defendant perform[ed] the act which is forbidden by statute. It is a general intent crime." *State v. Jones,* 339 N.C. 114, 148, 451 S.E.2d 826, 844 (1994) (citations omitted).

There is no requirement that the defendant have a specific intent to fire *into* the occupied building, only that he . . . (1) intentionally discharged the firearm *at* the occupied building with the bullet(s) entering the occupied building, or (2) intentionally discharged the firearm at a person with the bullet(s) entering an occupied building.

*State v. Byrd,* 132 N.C. App. 220, 222, 510 S.E.2d 410, 412 (1999) (citations omitted). Morin and Schabot's testimony established that defendant made threatening statements about his willingness to shoot if he "needed to" and that he pointed the gun "at [Schabot's] head" or "near [Schabot's] head." Defendant's own testimony is that he "fired down and away as to not hurt anyone." This is evidence that clearly supports the conclusion that defendant did intend to discharge the gun. Any discrepancies in testimony are issues for the jury to decide and do not warrant dismissal. It was not an accidental firing, although he may not have intended for the bullet to come to rest in the wall of the apartment building.

Defendant also contends that there was insufficient evidence that he shot "into" the apartment. He points to the fact that an "apartment" has been held to be an "enclosure" under N.C. Gen. Stat. § 14-34.1 in *State v. Cockerham,* 155 N.C. App. 729, 735, 574 S.E.2d 694, 698 (2003).[1] His argument is that the exterior wall does not form part of

---

1. Defendant is being prosecuted under the 2003 version of the statute because the offense happened in 2004. The statute has since been substantially amended to include the broader word "dwelling" in addition to "enclosure" and assigns a higher felony level to shooting into a "dwelling" than into an "enclosure." N.C. Gen. Stat. § 14-34.1 (2007). It is possible that a prosecution under the newer version would result in the reclassification of an apartment as a "dwelling." Such a reclassification would not damage the precedential value of the other parts of *Cockerham* because it would not change the fact that apartments are covered by the statute, but would only result in a harsher sentence.

the enclosure. He claims that because apartments are "enclosures" they are to be conceptualized as separate entities inside of the larger structure, which consists of all the support and exterior parts of the apartment building. Therefore, striking the exterior wall is not striking the "enclosure" of the apartment. Furthermore, he argues that in order to be "into" the "enclosure," as the plain meaning of "into" is commonly understood, the bullet must penetrate an interior wall of the apartment, or enter the apartment.

The claim that the exterior walls of the apartment do not constitute part of the enclosure is without legal merit. In *State v. Watson*, the bullets "hit the side of the house" and "hit a window" and were deemed to have been fired "into" the house. 66 N.C. App. 306, 308, 311 S.E.2d 381, 382 (1984). Although *Watson* involves a "building" and not an "enclosure," we find that the hitting of the exterior in both cases is analogous.

Also, the plain meaning of "into" includes "against" as in "crashed *into* a tree." *American Heritage College Dictionary* 712 (3d Ed. 1997) (emphasis added). This sentence does not mean "crashed *through* a tree." Similarly, discharging a firearm "into" an enclosure does not have to mean "through" the wall of the enclosure. *Cockerham* included the following definitions of "enclosure": "[a]n area, object, or item that is enclosed. . . . Something that encloses, such as a wall or fence." *Cockerham* at 734, 574 S.E.2d at 698 (citation omitted) (emphasis omitted). The exterior wall is nonetheless a wall, which the bullet was fired against, thereby fulfilling the requirement of being fired "into" the enclosure. The photographs of the hole by the door and testimony of the bullet entering the wall provide substantial evidence to support a conclusion of defendant's guilt. Thus, there is sufficient evidence of this element to withstand defendant's motion to dismiss.

Even if we were to rule that striking the exterior wall of an apartment was not "into" the apartment for purposes of this statute, such a ruling would contravene the purpose of the statute. "The protection of the occupant(s) of the building was the primary concern and objective of the General Assembly when it enacted G.S. 14-34.1." *State v. Williams*, 284 N.C. 67, 72, 199 S.E.2d 409, 412 (1973). Defendant was standing on the second floor landing of an apartment building late at night, when people are most likely to be at home. He knew or should have known it was likely that there were people all around him in the apartments, whether below him, above him, or in front of him. Simply firing down, as he testified he did intentionally, into the first floor

breezeway, was not any safer a decision than to fire directly past the people in front of him on the second floor breezeway. Firing a gun in or around an apartment building is extremely dangerous given that the shooter could never actually know that such a discharge would not strike an occupant.

The fact that the bullet did not penetrate an interior wall of apartment 204 was fortuitous for defendant. His conduct was just as dangerous as that of a person in a similar situation who fired a bullet that *did* happen to pierce an interior wall of the apartment, rather than simply lodging in some exterior part of the building. This reasoning is in line with our previous decision in *Cockerham*, in which we held that "[a] person who fires a gun through a common wall of an apartment is engaged in the same mischief as a person shooting into the building from the outside." Thus, defendant's first assignment of error is overruled. 155 N.C. App. at 735, 574 S.E.2d at 698.

**[2]** Defendant assigns plain error to the jury instruction that in order for the jury to find him guilty, it had to find that he discharged the firearm "without justification or excuse, that is, in self-defense." Because defendant did not object to the instruction at trial, this assignment of error is reviewed under the plain error standard, which requires him to show that the alleged error "probably resulted in the jury reaching a different verdict than it otherwise would have reached." *State v. Leyva*, 181 N.C. App. 491, 499, 640 S.E.2d 394, 399 (2007) (citations and quotations omitted). The error must be "so fundamental that it denied the defendant a fair trial and quite probably tilted the scales against him." *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993). He argues that this instruction led the jury to believe that self-defense was the only "justification or excuse" that could free him from criminal liability, foreclosing other justifications, such as accident.

However, defendant presented no evidence of any justification or excuse other than self-defense at trial. Defendant would have had the jury decide on its own what "justification or excuse" he could have had other than self-defense. In *State v. Hall*, we held that the trial court was not required to add "without justification or excuse" when the defendant did not offer sufficient evidence of self-defense or any other justification. 89 N.C. App. 491, 495-96, 366 S.E.2d 527, 529-30 (1988). Thus, the absence of any evidence of another justification or excuse, besides the self-defense evidence, frees the trial court from having to leave the jury instruction open to other such excuses.

Further, the issue of whether defendant accidentally fired is not a justification or excuse for shooting, but rather bears on the element of intent. If defendant had made a convincing showing that he accidentally discharged the weapon, the jury might not have found that he shot "willfully or wantonly" and thus could not be guilty of the crime charged. Thus, the addition of the limiting instruction "that is, in self-defense" was not plain error.

[3] Defendant claims that the trial court's instruction that "into" meant "into any part of the property structure" was reversible error because he insists that "into" must mean "entering." When reviewing jury instructions, "it is not enough for the appealing party to show that error occurred in the jury instructions; rather, it must be demonstrated that such error was likely, in light of the entire charge, to mislead the jury." *State v. Blizzard,* 169 N.C. App. 285, 296-97, 610 S.E.2d 245, 253 (2005) (citation and quotations omitted).

As explained above, "into" can also mean "against." We have held in at least two other cases that the "into" element is satisfied when bullets damage the exterior of a building, even though there is no evidence that the bullets penetrated to the interior. *See State v. Hicks,* 60 N.C. App. 718, 719, 300 S.E.2d 33, 34 (1983) (upholding a conviction when nineteen bullet holes were found in the victim's house and nineteen or twenty rifle shells were found outside the house); *State v. Musselwhite,* 54 N.C. App. 68, 72, 283 S.E.2d 149, 152 (1981) (upholding a conviction when the defendant or "someone in his group definitely fired the shots which damaged the building".) Moreover, "[t]he protection of the occupant(s) of the building was the primary concern and objective of the General Assembly when it enacted G.S. 14-34.1," not merely to keep bullets from entering the inside of buildings. *Williams* at 72, 199 S.E.2d at 412. Punishing only people whose bullets successfully pierce the interior walls of an apartment does not serve this objective. A thwarted attempt is, in theory, as much a danger to the occupants as a successful one because the shooter cannot know that his rounds will not pierce the interior walls.

Although the exact phrasing of the instruction may not have been ideal, it does adequately convey that the outside wall is a part of the enclosure of the apartment. Therefore, this instruction was not error.

In his next assignment of error, defendant tries yet again to draw a distinction between the exterior wall of the apartment and the interior wall. He claims that failing to instruct the jury that it would have

to find that apartment 204 was an "enclosure" amounts to plain error. Without this instruction, defendant claims, the jury would not know that the State was required to prove that the bullet had to pierce an interior wall in order to be considered discharged "into" that enclosure. As we have already concluded, there is no such difference between the exterior and interior walls of the apartment, even taking into account the apartment's status as an "enclosure." Therefore, it was not plain error to fail to instruct otherwise.

[4] Next, defendant argues that it was plain error for the trial judge not to instruct the jury that defendant had no duty to retreat when giving the instruction on self-defense. He claims that without this instruction the jury may have believed that he was under some duty to try to run away before discharging his firearm. This argument is incorrect in at least two ways.

First, defendant testified that he was unable to retreat because he did not have clear access to the stairway because he was "surrounded by five grown men." He went on to state that he "fired a single round in order to be able to startle [Schabot], to get away." Thus, if the jury did believe that he was under a duty to retreat, this testimony would clearly show that he tried to retreat and was unable to do so, which would satisfy such a duty. This would make such an instruction superfluous, and as such, cannot have resulted in a different verdict, which means that this omission cannot amount to plain error.

Second, it is likely that defendant did have a duty to retreat, which would make an instruction to the contrary incorrect. "In [assaults made with non-deadly force] the person assaulted may not stand his ground and kill his adversary, if there is any way of escape open to him, although he is permitted to repel force by force and give blow for blow." *State v. Pearson,* 288 N.C. 34, 39, 215 S.E.2d 598, 602-03 (1975) (citations omitted).

> The right of self-defense is only available, however, to a person who is without fault, and if a person voluntarily, that is aggressively and willingly, enters into a fight, he cannot invoke the doctrine of self-defense unless he first abandons the fight, withdraws from it and gives notice to his adversary that he has done so.

*State v. Skipper,* 146 N.C. App. 532, 538-39, 553 S.E.2d 690, 694 (2001) (citations and quotations omitted). It is likely that defendant did enter this fight voluntarily, as evidenced by his telling Schabot "not to be brave" and saying that this "was a situation where somebody could

get shot at or shot." Engaging in the verbal disagreement with threatening language certainly does not indicate abandonment of the fight.

However, we do not have to decide whether defendant did enter the fight voluntarily. At most, defendant was facing a misdemeanor assault from Schabot, which does not entitle defendant to use a firearm in defense. All the evidence, even defendant's own testimony, shows that neither Schabot nor any other men on the landing were armed. Furthermore, he admits that only two of the five men that he claims were on the landing were behaving aggressively. "Regardless of who started the altercation, therefore, Defendant was required to retreat from the nonfelonious assault rather than escalate the incident through the use of a weapon." *State v. Allred*, 129 N.C. App. 232, 235, 498 S.E.2d 204, 206 (1998). If anything, giving a more in-depth instruction on self-defense and duty to retreat would probably have damaged defendant's case. Thus, failing to instruct the jury that defendant did not have a duty to retreat does not amount to plain error.

**[5]** Defendant next asserts that the indictment did not give the trial court subject matter jurisdiction because it failed to allege the essential element that he knew or should have known that the property was occupied at the time he discharged the firearm. An indictment must give "[a] plain and concise factual statement in each count which, without allegations of an evidentiary nature, *asserts facts supporting every element* of a criminal offense and the defendant's commission thereof with sufficient precision clearly to apprise the defendant . . . of the conduct which is the subject of the accusation." N.C. Gen. Stat. § 15A-924(a)(5) (2007) (emphasis added). "[T]he purpose of an indictment . . . is to inform a party so that he may learn with reasonable certainty the nature of the crime of which he is accused . . . ." *State v. Coker*, 312 N.C. 432, 437, 323 S.E.2d 343, 347 (1984). "In general, an indictment couched in the language of the statute is sufficient to charge the statutory offense." *State v. Blackmon*, 130 N.C. App. 692, 699, 507 S.E.2d 42, 46 (1998).

First, this Court has already considered and rejected this argument:

We think the holding in *Williams* pertaining to the accused's knowledge of occupancy relates to evidence required at trial and not to allegations required in the bill of indictment. Consequently, we hold that an indictment under G.S. 14-34.1 which, as in the instant case, charges the offense substantially in the words of the

statute, contains allegations sufficient to apprise an accused of the offense with which he is charged and to enable the court to proceed to judgment.

*State v. Walker*, 34 N.C. App. 271, 274, 238 S.E.2d 154, 156 (1977) (citation omitted).

Second, the indictment here was clearly couched in the language of the statute and alleged all of the essential elements discussed above with respect to the motions to dismiss. It stated that defendant "unlawfully, willfully, wantonly and feloniously did discharge a Smith & Wesson .40 Cal PT 140 Millenium [sic], which is a firearm, into . . . Apartment 204 . . . , property that was occupied at the time of the offense by Nicholas Siwy." This covers the four elements that we listed in *Jones*. 104 N.C. App. at 258, 409 S.E.2d at 326. Thus, there was no defect in the indictment.

[6] Defendant last argues that the trial court's jury instruction that "into" means "into any part of the property structure" relieved the State of its burden of proving that defendant discharged a firearm into the "enclosure" located within the apartment building. He contends that this was a violation of his federal and state constitutional rights. This is yet another attempt to distinguish between the exterior and the interior walls of the apartment. We refuse to recognize such a distinction for the reasons stated previously.

Furthermore, in addition to failing to raise this constitutional question at the trial level, defendant cites no constitutional authority, federal or state, in support of this argument. Constitutional issues raised for the first time on appeal will not be considered. *State v. Benson*, 323 N.C. 318, 322, 372 S.E.2d 517, 519 (1988). Defendant claims that this was plain error because it had a probable impact on the jury's verdict. We do not find error here because, as already stated, the instructions amounted to an accurate description of the law. Nevertheless, the complete absence of any constitutional argument means that the assignment can only be evaluated for nonconstitutional violations that were properly preserved. *State v. Lloyd*, 354 N.C. 76, 87, 552 S.E.2d 596, 607 (2001). As we have stated already, we find no statutory basis for distinguishing between the interior and exterior parts of the walls of an enclosure. Accordingly, this assignment of error is overruled.

Having conducted a thorough review of the briefs and the record on appeal, we find no error.

No error.

Judges McGEE and JACKSON concur.